# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 29, 2013 Session

## STATE OF TENNESSEE v. WILLIAM RAY BOATWRIGHT

**Appeal from the Criminal Court for Knox County**
**No. 90020      Mary Beth Leibowitz, Judge**

---

**No. E2012-00688-CCA-R3-CD - Filed February 28, 2013**

---

The defendant, William Ray Boatwright, was convicted by a Knox County jury of especially aggravated robbery, a Class A felony, aggravated robbery, a Class B felony, especially aggravated burglary, a Class B felony, and two counts of aggravated assault, a Class C felony. The trial court merged the aggravated assault counts into the especially aggravated robbery conviction and sentenced the defendant as a Range I offender to twenty-five years at 100 percent for the especially aggravated robbery conviction, twelve years at thirty percent for the aggravated robbery conviction, and twelve years at thirty percent for the aggravated burglary conviction. The court ordered that the sentences be served consecutively, for a total effective sentence of forty-nine years in the Department of Correction. On appeal, the defendant challenges the sufficiency of the evidence establishing his identity as a perpetrator and argues that the trial court erred by failing to give a jury instruction on accomplice testimony and by enhancing his sentences within his range and ordering consecutive sentencing. Based on our review, we conclude that the evidence is sufficient to establish the defendant's identity, that the defendant has waived the issue regarding the jury instruction, and that the trial court did not abuse its discretion in sentencing the defendant to the maximum sentences within his range and ordering that they be served consecutively. However, we note under plain error review that Tennessee Code Annotated section 39-13-404(d) prohibits the defendant's dual convictions for both especially aggravated burglary and especially aggravated robbery. Accordingly, we modify the defendant's Class B especially aggravated burglary conviction to aggravated burglary, a Class C felony, and his sentence to ten years as a Range II, multiple offender for this offense. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

John M. Boucher, Jr., Knoxville, Tennessee, for the appellant, William Ray Boatwright.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of a home invasion/robbery that occurred very early on the morning of May 22, 2008, at the Knoxville apartment of Christy Hines. Hines was at home with her mother, Jamesina Thompson; her friend, Alora Williams; her cousin, Stephon Matthews; and her two young children when someone knocked on the door. Matthews cracked the door open and a group of armed, masked men rushed in, terrorizing the occupants, robbing Matthews of his cash, and taking a carton of cigarettes and a camcorder from the apartment. Just before leaving, one of the men, whom Williams later identified as the defendant, delivered a violent blow with his gun to Matthews' head, fracturing his skull. The Knox County Grand Jury subsequently returned a five-count indictment charging the defendant with especially aggravated robbery, aggravated robbery, especially aggravated burglary, and two counts of aggravated assault.

At the defendant's trial, Stephon Matthews testified that in May of 2008, he was seventeen years old, a high school football player, and living with his cousin, Christy Hines, in her Knoxville apartment. On the night of the burglary, he and his family were at home when someone knocked on the door. They asked who it was, and a person answered "Mike." He opened the door and four men rushed in, knocking him to the floor as they "slung the door open." He heard someone say, "[C]'mon Strong," and the men twice searched his pockets for his money as he lay on the floor. They were unable to get it, so he took $200 out of his pocket and threw it on the table for the men to take, saying, "[H]ere." Before the intruders left, one of the men who was standing over him said, "I'm sorry I've got to do this to you, Cuz," and then hit him in the head with a gun. Matthews testified that his skull was fractured, which required him to undergo emergency surgery and spend a week in the hospital. He said that his memory was impaired by his head injury and that he was no longer able to play football.

On cross-examination, Matthews acknowledged that his testimony at the preliminary hearing was that the man who struck him was wearing a blue bandana.

Jamesina Thompson testified that on May 21, 2008, she and her daughter, Christy

-2-

Hines, spent the afternoon sitting outside with her daughter's two children and a "bunch of little kids" from the community holding a dance contest for the children, which her daughter recorded on her camcorder. During that time, the defendant arrived with three other men, said hello to them, and then went up the steps to the neighbors that he was visiting.

Later that night, her daughter's friend, Alora Williams, came over to visit and Matthews, who had been out, returned home. Thompson testified that Hines was "getting her hair done" and the rest of them were watching television when someone knocked at the door. She twice asked who it was, and each time the person replied, "Mike." She explained that she asked twice because the next-door neighbor was named Mike, but he was Caucasian and she knew that it was not his voice at the door. Suspicious, she peeked out the window and saw that the person was not standing in front of the door where she could see him but instead beside the door wearing a hood. In the meantime, Matthews had gotten up to answer the door. She and her daughter both called out a warning to him, but he moved fast and they were too late to prevent him from opening the door, with his foot behind it so that he could peek out. As soon as he did so, there was a "big kaboom" as the door was burst all the way open.

Thompson testified that she got behind a large speaker in the living room and remained there without moving the entire time that the intruders were in the home. She heard someone say, "[Y]ou already know what time it is," followed by "[I]s there anybody else in here? If there's anybody else in here, come out now or I'll shoot everybody in here." At that point, Williams, who had fled from the room when the door burst open, came from around the corner and stood against the living room wall. After that, Thompson heard people rummaging back and forth throughout the home, one of the intruders call her granddaughter by name as he asked her if anyone else was in the apartment; someone asking her granddaughter why the light was so dim and telling her not to cry; Matthews volunteering to give up his money and one of the intruders saying, "[T]hat's good"; one of the intruders instructing another one to get a box of Newport cigarettes; the sound of feet moving away; a period of silence; one of the intruders saying, "[S]orry I got to do this to you, Cuz"; and then the sound of Matthews groaning.

Thompson testified that after the intruders left, Williams ran to shut the front door and she went to assist Matthews, who had "staggered up from the floor" and was lying slumped on the couch with blood running down his face. About eight or nine minutes later, Matthews' voice became garbled and he appeared to be having a seizure, so they called an ambulance, which transported him to the hospital for emergency surgery. Thompson testified that, in addition to Matthews' cash and the carton of cigarettes, the intruders took the camcorder that her daughter had been using earlier that afternoon. She said that the next day they found the camcorder, which had been broken "to shreds," behind a neighbor's house.

Thompson testified that she informed the police officers who investigated the crimes that one of the intruder's voices sounded very familiar to her. After the police left, she found two slugs on the carpet, which she turned over to the police. Thompson said that she heard a clicking sound at the time one of the intruders threatened to shoot everyone in the apartment, and she therefore assumed that the slugs fell from his gun at that time.

Christy Hines testified that at the time of the burglary she made money by selling crack cocaine from her Knoxville apartment. She said that on the afternoon of May 21, 2008, she was sitting outside in the parking lot with her mother and her children "making her sales" and videotaping the children when the defendant arrived with James Cade and two other men. She stated that the defendant and Cade remained at the complex for a couple of hours and saw her making drug sales during that time.

Hines testified that she, her family, and her friend, Alora Williams, were inside her apartment later that night when a man wearing a hood knocked at the door and identified himself as "Mike." She said she was standing right behind her cousin when he cracked the door open, and she saw James Cade pulling a blue bandana over his face just before he and the other men rushed into the apartment. She stated that she got down on the floor between the wall and the couch, where she heard the intruders say a number of things, including: "[Y]'all mother fuckers know what it is"; "[W]here the shit at"; "[C]'mon, Strong"; and "[B]itch, get out [of] the kitchen and come back in there or I'm shooting everybody in the house." She also heard one of the men direct another to get the carton of Newports, and one of them say, just before leaving, "I hate to do you like this, Cuz," which was followed by a sound like an egg splattering and Matthews moaning.

Hines testified that the men took Matthews' cash, her camcorder, and the carton of cigarettes. She described finding the two bullets in the living room after the police left her apartment and her discovery of the smashed camcorder behind the neighboring building the next day. She said that she described Cade to the police and later picked his photograph out of a photographic lineup. She also testified that she told the police she recognized the defendant's voice and that she gave them his name.

Alora Williams testified that she fled to the kitchen when the door of the apartment was burst open, but "the next thing [she] kn[e]w, a big gun was in [her] face" and one of the intruders threatened to shoot everyone in the apartment if she did not come out. She, therefore, put her hands in the air and returned to the living room, where she slumped against a wall and watched everything that transpired. She said that two men ran to the back of the apartment while two remained in the front. One of those two was wearing a blue bandana and the other one was wearing a stocking cap pulled down over his eyes. While the men in the back of the apartment were making noises that sounded as if they were tearing the rooms

apart, the man in the stocking cap asked her questions about herself such as her name and where she was from, which she found odd. After the two men in the back ran to the front of the apartment and the men were heading out the door, the man who had been talking to her turned back and said, "I hate to do this to you, Cuz," before striking Matthews on the head with his gun.

Williams made a positive courtroom identification of the defendant as the man who struck Matthews in the head and said that Matthews had already given his money to the defendant before the defendant struck him. She said that she could see "straight through" the defendant's stocking cap and that she also recognized him by his voice. Williams explained that she had met the defendant before the burglary at a local mall, where he had engaged her in a couple of brief conversations and asked for her telephone number. They never went out on a date, however.

On cross-examination, Williams reiterated that she was able to see through the defendant's stocking cap, which, she said, was made of "see-through mesh." She testified that the defendant was the only one who talked and that her attention was concentrated on his mouth and his distinctive teeth, which consisted of front teeth that "stuck out" and bottom teeth that were discolored, rotting, and "kind of wrangled." On redirect examination, she testified that she identified the defendant from a photographic lineup about a week after the burglary and at a preliminary hearing held several weeks after the burglary.

James Cade testified that he was with the defendant in the parking lot of Hines's apartment complex for about thirty minutes early in the evening of May 21, 2008, before leaving by himself. Later that day, the defendant called to ask where he could get some drugs, and he gave him Hines's name. He and the defendant returned to the complex, met Hines as she was coming out of her apartment, and asked her about her drugs. She informed them that she did not have any at that time, so they left the complex again and he dropped the defendant off before going home and then to bed.

At about 1:30 or 2:00 a.m. the next morning, the defendant called to ask for a ride. Cade testified that he picked up the defendant and two men who were with the defendant and took them to Hines's apartment. All four of them walked up to Hines's porch, and the defendant knocked on the door and announced that he was "Mike." When the door opened "a little bit," the defendant took out a gun and he and his two friends "bum-rushed in." Cade said that he initially "froze up," but then returned to his car and went home and back to bed. The next morning, the defendant called to ask why he had deserted them and he explained to the defendant that he "didn't know it was going to go down like that." The defendant then told him that he had to hit Matthews in the head with his pistol "so he couldn't remember nothing" because Matthews had gotten too close to him when he was taking his money.

Cade, who said he had no criminal record before his charges in the instant case, testified that he had pled guilty to facilitation of especially aggravated robbery for his role in the crimes. On cross-examination, he acknowledged that he was originally charged with not only especially aggravated robbery, but also aggravated robbery and especially aggravated burglary. He further acknowledged that he had agreed to testify against the defendant in exchange for being allowed to plead guilty to the lesser-included offense of facilitation of especially aggravated robbery and the dismissal of the other charges against him.

Investigator Tiffany Copley of the Knoxville Police Department's Forensic Unit identified the bullets collected from the crime scene as well as various photographs of the apartment and Matthews' head injury and testified that she was unable to obtain any usable fingerprints from the apartment.

Matthews' medical records, which included a discharge summary noting that he had surgery for a skull fracture, were admitted as an exhibit by stipulation of the parties and published to the jury.

Investigator Charles Lee of the Knoxville Police Department's Major Crimes Unit testified that he showed Williams a photographic lineup on May 30, 2008, from which she positively identified the defendant. On that same day, he showed Hines a separate photographic lineup from which she made a positive identification of James Cade.

Following the trial court's denial of the defendant's motion for judgment of acquittal, Ebony Wright testified on the defendant's behalf that the defendant was with her at a nightclub from approximately 11:30 to 11:45 p.m. on May 21, 2008, until 3:45 a.m. the next day. On cross-examination, Wright testified that her earlier preliminary hearing testimony in which she said that she and the defendant were together on the night of May 22, 2008, was a "miscommunication." She acknowledged having testified at that hearing that she had been watching the Cavaliers play the Lakers on the night the defendant came to visit her. When informed that the game did not occur on that night, she testified that "it might've been a different team." Finally, she acknowledged that she had been convicted of shoplifting in June 2000.

The defendant elected not to testify and rested his case without presenting any additional evidence. Following deliberations, the jury convicted him of the indicted charges.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends that the trial court erred by denying his motion for judgment of acquittal. "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant asserts that the evidence is insufficient to sustain his convictions because the only evidence linking him to the crimes is the uncorroborated testimony of his alleged accomplice, James Cade. In support, he cites the inconsistencies between Cade's

account and those provided by the victims. He also argues that Williams' identification of him from the photographic lineup "is completely flawed and cannot be utilized to convict [him] since his face was never seen." The State disagrees, arguing, among other things, that the evidence would have been sufficient for the jury to find the defendant guilty of the crimes even if Cade had not testified at trial.

A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (citing State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)); State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). This principle has been described as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

We agree with the State that there was sufficient evidence in this case, wholly apart from Cade's testimony, from which the jury could find the defendant guilty of the offenses beyond a reasonable doubt. Both Hines and her mother saw the defendant and three other men at the apartment complex early on the afternoon of May 21, 2008, during a time when Hines was making drug sales and videotaping the children outside in the parking lot. Both also thought that the voice of one of the intruders sounded familiar, and Hines told the police that she thought she recognized the defendant's voice. Williams made a positive courtroom identification of the defendant as the man who robbed Matthews and struck him in the head and explained that she had met him earlier and recognized him at the apartment from his voice, distinctive mouth and teeth, and his whole face, which she could see through the

-8-

mesh-like stocking cap he had pulled down over his eyes. She also testified that she identified him from a photographic lineup she was shown by the police approximately a week after the home invasion/robbery and then again at a later preliminary hearing. The identification of a defendant as the perpetrator of a crime is a question of fact for the trier of fact to determine from the evidence presented at trial. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Further, the identification testimony of a victim is sufficient, alone, to support a conviction. State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); Strickland, 885 S.W.2d at 87. We, therefore, conclude that the evidence is sufficient to sustain the defendant's identity as a perpetrator of the crimes.

Although we have concluded that the evidence is legally sufficient to sustain the defendant's convictions, we note under plain error review that Tennessee Code Annotated section 39-14-404(d) provides that acts which constitute the offense of especially aggravated burglary may be prosecuted either under the especially aggravated burglary statute, or under any other applicable section, such as the especially aggravated robbery in this case, but not under both. See Tenn. Code Ann. § 39-14-404(d) (2010); see also State v. Shanda Alene Wright, No. M2006-02343-CCA-R3-CD, 2008 WL 371258, at *7 (Tenn. Crim. App. Feb. 11, 2008), perm. app. denied (Tenn. Oct. 27, 2008). Accordingly, we modify the defendant's especially aggravated burglary conviction to aggravated burglary, a Class C felony. Because the defendant has the requisite number of prior felonies to be classified as a multiple offender for sentencing for a Class C felony, we modify his sentence to ten years, the maximum in his range.

## II. Jury Instruction on Accomplice Testimony

The defendant next contends that the trial court erred by not issuing a jury instruction on corroboration of accomplice testimony, arguing that "[t]he facts are not disputed as to Mr. Cade's participation in the alleged crime." The State responds by arguing that the defendant has waived this issue by never requesting a special instruction on accomplice corroboration, not including the trial court's alleged failure to instruct the jury as an issue in his motion for new trial, and not including the trial court's instructions to the jury in the record on appeal. We agree with the State.

"[A] defendant has a right to a correct and complete charge of the law," State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citations omitted), and the trial court has the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citation omitted). A defendant may, however, waive an issue regarding the failure to issue a jury instruction by not including an adequate record for appellate review. Although the trial transcript in this case states that "[a] true and exact copy" of the jury charge "is found in the technical record," the trial court's

charge to the jury is nowhere in the record before this court. It is the defendant's duty to prepare a fair, accurate, and complete record on appeal, see Tenn. R. App. P. 24(b), and when necessary parts of the record are not included, we must presume that the trial court's ruling was correct. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Moreover, there is nothing in the record to show that the defendant ever requested the jury instruction. "In the absence of a special request, the trial court does not err by failing to instruct the jury about accomplice testimony even if the circumstances of the case warrant such an instruction." State v. Anderson, 985 S.W.2d 9, 17-18 (Tenn. Crim. App. 1997) (internal citations omitted). The defendant also failed to raise the issue in his motion for new trial. Accordingly, we conclude that the defendant has waived this issue on appeal.

## III. Sentencing

Lastly, the defendant contends that the trial court imposed an excessive sentence by erroneously applying enhancement factors based on the uncorroborated testimony of his alleged accomplice and by erroneously finding that he met the consecutive sentencing criterion of a professional criminal who had knowingly devoted his life to criminal acts. The State disagrees, arguing that the trial court appropriately sentenced the defendant within the applicable range and that the record supports its imposition of consecutive sentencing. We, again, agree with the State.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). As for consecutive sentencing, Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including the three found by the trial court in this case: "[t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood"; "[t]he defendant is an offender whose record of criminal activity is extensive"; and "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(1), (2), (4) (2010).

At the sentencing hearing, the trial court noted that the thirty-three-year-old defendant had an "extensive, extensive criminal history" dating back to the time he was a juvenile, which consisted of "many assaultive" behaviors and aggravated robbery convictions; that he lacked any legitimate work history; that he was a reported gang member; that the trial testimony of Williams showed that he directed the other men involved in the crimes; that he had been on bond for a drug case at the time of the instant offenses and "did not comply with the conditions of that release"; that there were a number of people, including young children, present in the apartment and terrorized by the defendant's actions; and that the defendant used a firearm to strike Matthews in the head and to terrorize the occupants of the apartment. The trial court found the following enhancement factors applicable in the case: the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; the defendant was a leader in the commission of an offense involving two or more criminal actors; the offense involved more than one victim; the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; the defendant possessed or employed a firearm during the commission of the offense; the defendant had no hesitation about committing a crime when the risk to human life was high; and the defendant was released on bond at the time of the offenses. See Tenn. Code Ann. § 40-35-114(1), (2), (3), (8), (9), (10), (13) (2010). The trial court found no applicable mitigating factors.

The trial court, therefore, sentenced the defendant to the maximum sentences in his range of twenty-five years as a Range I, violent offender for the especially aggravated robbery conviction, twelve years as a Range I, standard offender for the aggravated robbery conviction, twelve years as a Range I, standard offender for the especially aggravated burglary conviction, and twelve years as a Range II, multiple offender for each of the aggravated assault convictions, which the trial court then merged into the especially aggravated robbery conviction. Finding the defendant to be a professional criminal who had knowingly devoted his life to criminal acts as a major source of his livelihood, an offender whose record of criminal activity was extensive, and a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, the trial court ordered that he serve his sentences consecutively to each other, for an effective sentence of forty-nine years.

We agree with the State that the trial court did not abuse its discretion in imposing the maximum sentences within the defendant's applicable ranges or by ordering that they be served consecutively to each other. The record reflects that the trial court imposed the maximum sentences for the defendant's offenses after proper consideration of the purposes and principles of our sentencing act and consideration of any applicable enhancement or mitigating factors. See Bise, 380 S.W.3d at 706. As for the trial court's order of consecutive sentencing, we note that it did not make the specific additional Wilkerson findings that are required before a trial court bases an order of consecutive sentencing on a classification of a defendant as a dangerous offender. See State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995) (holding that trial court must make additional findings for dangerous offender criterion that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from his further criminal conduct). The criteria listed in the consecutive sentencing statute are, however, stated in the alternative, which means that only one need exist to support the appropriateness of consecutive sentencing. Here, the trial court also based its order of consecutive sentencing on its classification of the defendant as a professional criminal and as an offender whose record of criminal activity is extensive. We conclude that the record supports these findings. The defendant's presentence report shows a substantial criminal record, a history as a gang member, and a self-reported employment history that consists of only one day at a Shoney's restaurant in 2004.

Accordingly, we affirm the trial court's imposition of the maximum sentences within the defendant's applicable ranges for each of his convictions and its order of consecutive sentencing. As previously discussed, the defendant's especially aggravated burglary conviction is modified to a conviction for aggravated burglary, with a sentence of ten years as a Range II offender. We remand to the trial court for entry of a corrected judgment to reflect these modifications. In all other respects, the judgments of the trial court are affirmed.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the defendant's convictions for especially aggravated robbery and aggravated robbery and the sentences imposed for those convictions. We modify the defendant's especially aggravated burglary conviction to aggravated burglary, with a sentence of ten years as a Range II offender, and remand to the trial court for entry of a corrected judgment for this conviction.

_____
ALAN E. GLENN, JUDGE